USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _9-18-19_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OPTIONALITY CONSULTING PTE. LTD,

Plaintiff,

-against-

JAMES NEKOS, JOHN PECORARO, &
EDGE TECHNOLOGY GROUP LLC.,

Defendants.

---

18-cv-5393 (ALC)

ORDER

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Optionality Consulting Pte. LTD ("Optionality") brings nine charges against Defendants Edge Technology Group LLC ("Edge"), James Nekos ("Mr. Nekos"), and John Pecoraro ("Mr. Pecoraro") (collectively, "Defendants") related to the parties' commercial relationship. Defendants now move to dismiss the Complaint in its entirety. For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I.     Factual Background

### A. The Parties

Optionality, founded in 2011 by Maria Gabriela Bianchini, is a consulting firm incorporated under the laws of Singapore that specializes in global financial regulatory issues. Comp. ¶¶ 1, 12. In 2015, Optionality developed CyberSAIF, a corporate-governance led cyber security offering tailored to the legal, regulatory, and business needs of alternative asset managers such as hedge funds, venture capital, and private equity groups. *Id.* Edge is a United States corporation proficient in the technical aspects of cybersecurity. *Id.* ¶ 2. On March 14, 2016, Emily Randall, Managing Director of Edge TG Asia Pte. Ltd ("Edge TG Asia"), reached out to Optionality and expressed a desire to offer a product to address an issue between hedge fund management and IT

1

security. *Id.* ¶ 26. On March 17, 2016, Edge TG Asia and Optionality executed a global Non-Disclosure Agreement (the "NDA"). *Id.* ¶ 32. James Nekos and John Pecoraro are directors of Edge TG Asia.[1] *Id.* To evaluate business possibilities with Edge TG Asia, Optionality disclosed Confidential Information to Edge TG Asia. *Id.* ¶ 36.

## B. The Revenue Sharing Agreement

The discussions facilitated by the NDA led to the execution of a Revenue Sharing Agreement (the "RSA") that was effective as of May 1, 2016. Comp. ¶ 37.[2]

Edge Hong Kong and Optionality agreed that Edge Hong Kong would receive 61% (and Optionality would receive 39%) of the revenues under the RSA. *Id.* Section 1.1 defines the scope of the relationship: "The Parties hereby agree to jointly develop, promote and market a "Cyber:SAIF" offering that is a combination of information technology and corporate governance services." Section 2 reads: "the Parties acknowledge that each brings valuable assets and intellectual property to Cyber:SAIF. The joint marketing materials relating to the Cyber:SAIF service and the Intellectual Property Rights relating to the Cyber:SAIF name shall be jointly owned by the Parties." *Id.* Section 5.3 of the RSA provides that it would not be a limitation on either party's ability to market its own services to potential clients, and expressly limited the geographic scope of the parties' agreement: "[E]ach party may continue to market their own individual product offerings, which for clarity may include the services each Party offers as part of the Cyber:SAIF service. For clarity, this Agreement … applies only to Parties

---

[1] Specifically, the parties to the NDA are Plaintiff and Edge TG Asia Pte Ltd, an EDGE Singapore affiliate.

[2] Optionality did not attach the RSA to its Complaint, but it is specifically pleaded and attached as Exhibit A to the declaration of John Pecoraro, dated October 15, 2018 (the "Pecoraro Declaration"). In deciding a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference … and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000); *see also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Specifically, the parties to the RSA are Plaintiff and Edge TG Hong Kong Limited, an EDGE subsidiary.

and their affiliates located in Singapore and Hong Kong." *Id.* Section 6.1 of the RSA also

provided that the parties were not partners or in a joint venture.[3] Section 6.4 of the RSA also

contained an integration clause that provided: "This Agreement completely and exclusively

states the agreement between Optionality and Edge regarding its subject matter. This Agreement

supersedes and governs all prior or contemporaneous understandings, representations,

agreement, or other communications between Optionality and Edge, oral or written, regarding

such subject matter." Finally, the RSA also provided in Section 6.10 that its terms could not be

waived by any alleged course of dealing without a signed writing, and that no claims of course of

conduct could expand the limited scope of this simple agreement. *Id.*[4]

### C. Subsequent Agreements

After securing multiple clients in Hong Kong, Edge sought to replicate this success outside

of Asia. Comp. ¶ 14. On November 29, 2016, Mr. Nekos, an Edge director, expressed to Ms.

Bianchini, "[l]et me know when you are in town and available again. The expansion of what we

started with the JV have been a topic of discussion and I would like to know your thoughts about

the US market.  Looking forward to it." *Id.* ¶ 42. On January 11, 2017, Bianchini and Nekos met

in New York City and agreed to enter a partnership between Edge and Optionality. *Id.*

On July 18, 2017, Ms. Bianchini met with EDGE directors to discuss the formal launch of

CyberSAIF in the U.S. Compl. ¶ 51. There, the parties agreed to devote their respective

companies' resources to their new joint venture, which included developing the U.S. CyberSAIF

offering. *Id.* Edge and Optionality further agreed that: (a) Optionality's trade secret and

---

[3] Section 6.10 of the RSA specifically provides: "Optionality and Edge are independent contractors and this Agreement shall not establish any relationship of partnership, joint venture, employment, franchise or agency between Optionality and Edge."
[4] Section 6.1 of the RSA specifically provides: "No course of dealing shall be deemed to amend the Agreement in the absence of a writing signed by duly authorized representatives of each party."

confidential information would be used to pitch prospective clients; (b) Optionality's trade secret and confidential information would be used in providing services to these clients; (c) Edge would use its confidential customer list to pitch CyberSAIF to clients; (d) Edge would use its confidential information on its existing customers in order to secure and service clients; (e) Optionality personnel would perform all high-value analysis and implementation based on that analysis; and (f) Edge would provide the technical assistance for that analysis. *Id.*

The parties agreed that Optionality would develop the materials for a CyberSAIF offering in the U.S. and U.K., and Optionality and Edge would jointly pitch CyberSAIF to Edge's U.S. clients. Compl. ¶ 52. The parties also agreed that each would split profits, losses, and be afforded voting rights in accordance with the same 61/39 split provided in the RSA, with Edge receiving 61% and Optionality receiving 39%. *Id.*

Months later, Optionality and Edge co-ventured to sell CyberSAIF. Compl. ¶ 57. The parties continuously referred to CyberSAIF as a partnership or a joint venture in emails, internal and external documents, and orally. *Id.* In client pitch materials, as well as on the CyberSAIF.com website, CyberSAIF is shown as a joint offering from Optionality and Edge, accompanied by the slogan, "A Partnership Built on Expertise." *Id.* Optionality, believing the parties' agreed to a partnership, spent hundreds of hours developing CyberSAIF materials, hired staff to service the new fully spun entity, and forewent other lucrative business opportunities. *Id.*

In August of 2017, Ms. Bianchini conducted joint CyberSAIF marketing meetings with Mr. Nekos and developed the statement of work for Client T. Compl. ¶ 58. Mr. Nekos and Ms. Bianchini conducted joint meetings reagarding CyberSAIF's launch. *Id.* Ms. Bianchini then met with Mr. Pecoraro and an EDGE information security engineer, to outline CyberSAIF and its component parts. *Id.* During this meeting, Ms. Bianchini described cybersecurity services in

detail, which included Optionality's trade secret and confidential information, the necessary components of a CyberSAIF proposal, and how this information should be presented in the proposal for Client T. *Id.*

### D. Optionality's Allegations and the Draft Agreement

In early 2018, Mr. Pecoraro stopped responding to Optionality's inquiries. Compl. ¶ 71. Mr. Nekos and Ms. Randall continued to drive CyberSAIF's development by approving material and jointly pitching clients. *Id.* ¶¶ 75-84. Mr. Pecoraro remained unresponsive and worked to create an Edge version of the higher value cybersecurity components using Optionality's trade secrets to reduce Optionality's participation in the global offering. *Id.* ¶¶ 72, 74-76.

In March 2018, Mr. Pecoraro reappeared to address the parties' revenue share split. Compl. ¶ 85. This prompted Ms. Bianchini to express her belief that the parties should reduce the entire Agreement to writing. *Id.* Mr. Pecoraro shared the belief and asked Optionality to send a written agreement for his review. *Id.*

Later in March 2018, Optionality sent Edge a Draft Agreement.[5] The Draft Agreement states it was intended as a written amendment to the existing RSA between Optionality and the Edge entities. *Id.* The cover email transmitting the Draft Agreement to Edge states:

> the only changes are (1) to change the dates of the agreement to now (2) to amend and restate to include both US and UK (2) to take out the language in section 5.3 that limited the agreement to Asia. That's it. Otherwise, its the document we negotiated and agreed about 18 months ago.[6]

On April 27, 2018, Mr. Pecoraro produced a marketing book to Ms. Bianchini labeled "Edge Security Services". Compl. ¶ 88. These marketing documents overwrote CyberSAIF, falsely

---

[5] See Exhibit B to the Pecoraro Declaration. Plaintiff did not attach the Draft Agreement to the Complaint, but it is specifically pleaded in the Complaint. See Compl. ¶ 85. Therefore, the Court may consider it in deciding this Rule 12(b)(6) motion. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (complaint incorporated by reference emails where plaintiff "referred in her complaint to [the] e-mails"); *Worldwide Servs. v. Bombardier Aero. Corp.*, 2015 U.S. Dist. LEXIS 130974, at *24-25 (S.D.N.Y. Sept. 22, 2015) (emails incorporated by reference in complaint because "documents [were] clearly referenced by the [c]omplaint" and "highly relevant").
[6] *See* ECF 21-2.

stated that Edge created the offering, and claimed it as part of an Edge Security Services offering. *Id*. EDGE circulated these documents to at least one client group. *Id*.

On May 4, 2018, Ms. Bianchini sent a letter to Mr. Nekos expressing her concern that Edge had: (1) taken steps to delay scaling CyberSAIF in the U.S.; (2) sought to prevent Optionality from seeking other technical partners; and (3) worked to suppress Optionality's enterprise value while simultaneously "withholding cybersecurity marketing and development efforts from Optionality for the purpose of expanding into Optionality's side of the partnership, in an apparent effort to claw back part of our revenue share or somehow drive us out." Comp. ¶ 93. Ms. Bianchini noted: "[s]uch behavior violates our binding agreements to jointly develop CyberSAIF as a partnership, is fraudulent misrepresentation, [and] takes our intellectual property". *Id*. Ms. Bianchini asked Edge to immediately perform its obligations under the Agreements. *Id*. In response, Mr. Nekos refused to perform its obligations under the Agreements and threatened to formally terminate the relationship. *Id*. ¶ 94. To date, Edge has only jointly pitched CyberSAIF to a very small handful of its global client base. *Id*. at 97.

## II.  Procedural Background

Plaintiff filed its Complaint on June 14, 2018. ECF No. 1. The Complaint includes the following nine counts:1) breach of contract based on the alleged Partnership Agreement; 2) breach of contract based on the alleged Global Revenue Sharing Agreement; 3) unjust enrichment; 4) quantum meruit; 5) promissory estoppel; 6) misappropriation of trade secrets under the Defend Trade Secrets Act of 2016; 7) misappropriation of trade secrets under state law; 8) common law fraud; and 9) breach of fiduciary duty. *Id*.

On November 13, 2018, Defendants filed the instant motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that it fails as a matter

of law since the alleged oral contracts are unenforceable and none of the quasi contract claims can stand in the face of the parties' written contract that defines and circumscribes their commercial relationship. ECF Nos. 27, 29. Plaintiff filed its opposition on November 20, 2018 and Defendants replied on December 4, 2018. ECF Nos. 30-31. The Court considers the motion fully briefed.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts as true all factual allegations in the complaint and draws all reasonable inferences in plaintiff's favor. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S, at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

## DISCUSSION

### I.     Counts I and II: Breach of Contract

To prevail on a breach of contract claim under New York law, Plaintiff must establish

"(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *United States Bank Nat'l Ass'n, v. Dexia Real Estate Capital Markets*, 959 F. Supp. 2d 443, 447 (S.D.N.Y. 2013) (citing *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)). Plaintiff claims the parties entered into an oral partnership Agreement related to activities in the U.S. and the U.K., governed by New York law. Comp. ¶¶ 13, 39-41. Defendants argue Plaintiff's breach of contract claims are based on unenforceable oral agreements and must be dismissed with prejudice as a matter of law.

New York law permits oral contracts. *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir. 1997) (citing *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)). However, "an oral agreement is not enforceable unless there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Anderson v. Greene*, No. 18-1773-cv, 2019 U.S. App. LEXIS 15680, at *6 (2d Cir. May 28, 2019) (citing *Kelly v. Bensen*, 151 A.D.3d 1312, 58 N.Y.S.3d 169, 172 (3d Dep't 2017).

The Second Circuit considers several factors to determine whether the parties intended to be bound by an oral contract, including: (1) whether a party expressly required the agreement be in writing to be enforceable; (2) partial performance of the contract; (3) whether the parties agreed to all of the alleged contract terms; and (4) whether the agreement at issue is the type of contract that is usually written. *Id.*

A. **The Court may Consider the Draft Agreement**

As a threshold matter, the Court must address the Draft Agreement. According to the Complaint, Plaintiff created this document to reflect the parties' alleged oral agreements and e-

mailed it to EDGE for review. Plaintiff did not attach the Draft Agreement to its Complaint and argues that the Court therefore cannot consider it in deciding this motion to dismiss. The Court disagrees.

The Complaint incorporated the Draft Agreement by reference. Thus, the Court may consider it. In paragraph 85, Plaintiff pleads:

> Ms. Bianchini broached the subject of taking the ministerial step of reducing the Agreement to writing, as it would be "cleaner." Mr. Pecoraro replied that he also thought it was time to reduce to writing the agreement between Optionality and Edge for the US and the UK. He asked for Optionality to send the written agreement for his review.

Compl. ¶ 85. Plaintiff does not dispute that the Complaint references the Draft Agreement, the document's authenticity, or that Ms. Bianchini sent the Draft Agreement to Defendants to memorialize the parties' understandings. Rather, Plaintiff contends that the Draft Agreement bears no weight in deciding this 12(b)(6) motion since the Complaint did not "solely" rely on it. However, Plaintiff misstates the standard for considering material beyond the Complaint.

In the Second Circuit, district courts deciding a motion to dismiss may consider: 1) factual allegations in a plaintiffs' complaint; 2) documents attached to the complaint as an exhibit or incorporated in it by reference; 3) matters of which judicial notice may be taken; and 4) documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on to bring suit. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)[7]; *see also Taub v. Arrayit Corp.*, 2017 U.S. Dist. LEXIS 198287, at *3 (S.D.N.Y. Nov. 30, 2017).[8]

---

[7] With regards to this fourth category, the Second Circuit has clarified that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)). In other words, the document must be "integral" to the complaint for a district court to consider it. *See Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003).

[8] This is of course a disjunctive list. Thus, it is only "where a document is not incorporated by reference," that a court needs to weigh whether or not the complaint 'relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *DiFolco*, 622 F.3d at 111.

Plaintiff cites *Pearce v. Manhattan Ensemble Theater, Inc.*, and argues courts may only

consider a document "relied" upon only if the document "is one on which the plaintiff solely

relies[,] and which is integral to the complaint." 528 F.Supp.2d 175, 178 (S.D.N.Y 2007).

However, *Pearce* is inapposite. In *Pearce*, the complaint at issue "[made] no reference to the

draft agreement". *Id.* Thus, the court only considered whether plaintiff relied on the document to

draft the complaint.[9]

Here, in contrast, Plaintiff's Complaint directly and unambiguously references both the Draft

Agreement—as an implementation of the alleged oral agreement—and the transmission of that

Draft Agreement to Defendants. *See* Compl. ¶ 85. Therefore, the Court may consider both the

Draft Agreement and its cover email. Indeed, the Second Circuit has pointed out that frequently

"the incorporated material is a contract or other legal document containing obligations upon

which the plaintiff's complaint stands or falls, but which for some reason—usually because the

document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not

attached to the complaint." *Global Network Commmuns., Inc. v. City of New York*, 458 F.3d 150,

157 (2d. Cir 2006).

Moreover, in addition to being incorporated by reference, the Draft Agreement is integral

to Plaintiff's claims. Plaintiff admits that the Draft Agreement reflects the terms Plaintiff

explicitly chose to document the parties' new relationship and the various oral agreements that

form the bases for the Complaint. Despite the Court's duty to draw all reasonable inferences in

Plaintiff's favor, Plaintiff's decision not to present a document fundamental to the viability of its

---

[9] The Second Circuit has emphasized that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original). By the Second Circuit's standards, the plaintiff in *Pearce* did not rely on the draft agreement to prepare the complaint since: plaintiff did not reference the draft agreement; Plaintiff did not sign the draft agreement; and the parties disagreed about whether and how the draft agreement related to their relationship. *Pearce*, 528 F. Supp. 2d at 179-180.

claims should not shield the Court from considering this document. *Cortec Indus, Inc. v Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1992) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion"); *Berman v. Sugo LLC*, 580 F. Supp. d 191, 200-01 (S.D.N.Y. 2008) ("Where, as here, the pleader has notice of documents that are integral to its claims, the pleader may not avoid the Court's consideration of such documents simply because they contain material adverse to their claims").

It is well established that "where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls." *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008) ("the court is not obliged to credit the allegations in the complaint"). Plaintiff created the Draft Agreement, sent it to Edge in an email describing it as intended to "just extend the existing agreement", and explicitly referenced it in the Complaint. Accordingly, the Court may consider The Draft Agreement in the instant motion to dismiss.

### B. The Statute of Frauds Bars Plaintiff's Breach of Contract Claims

Defendants contend that even if an oral contract existed, it is unenforceable because of the Statute of Frauds, which invalidates any unwritten agreement incapable of performance within one year. *See Velez v. Sanchez*, 693 F.3d 308, 331-32 (2d Cir. 2012) (affirming the Statute of Frauds-based dismissal of a breach of contract claim under Rule 12(b)(6)). Defendants also note that the Draft Agreement sets a three-year fixed term.

N.Y. Gen. Oblig. Law § 5-701(a) bars the enforcement of an oral contract that "[b]y its terms is not to be performed within one year from the making thereof." Thus, "[a] contract forming a

partnership to be continued beyond one year, is within the statute of frauds." *Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 827 (2d Cir. 1984). *See also Pace v. Perk*, 81 A.D.2d 444, 457-58, 440 N.Y.S.2d 710, 718 (1981) ("Where a parol agreement is, by its express terms, for a period exceeding one year it is unenforceable"); *BPP Wealth, Inc. v. Weiser Capital Mgmt., LLC*, 623 F. App'x 7, 12 (2d Cir. 2015) (New York's statute of frauds encompasses "only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year." (quoting *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007));

New York courts interpret the Statute of Frauds narrowly. *Pearce*, 528 F. Supp. 2d at 180; *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 472 N.E.2d 992, 993-94, 483 N.Y.S.2d 164 (N.Y. 1984). The New York Court of Appeals has stated that the Statute "encompass[es] only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year. . . . however unexpected, unlikely, or even improbable that such performance will occur during that time frame." *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 694 N.E.2d 56, 58; 670 N.Y.S.2d 973 (N.Y. 1998) (citations and internal quotation marks omitted); *JNG Const., Ltd. v. Roussopoulos*, 135 A.D.3d 709, 22 N.Y.S.3d 567 (2d Dep't 2016).

Here, Plaintiff asserts that the partnership was "without a term of definite duration". Pl.'s Opp. at 10. However, Plaintiff's Draft Agreement refutes that assertion. The Draft Agreement reflects Plaintiff's view of the actual terms of the parties' oral agreement. Thus, the Court need not rely solely upon the inconsistent allegations in the Complaint or Plaintiff's moving papers. *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("If a plaintiff's allegations are contradicted by [a document incorporated by reference], those allegations are insufficient to defeat a motion to dismiss"). The Draft Agreement explicitly provides that the

parties orally agreed to a three-year fixed term.

Therefore, considering the Draft Agreement's express terms place the oral agreement within the Statute of Frauds, Plaintiff's breach of contract claims fail as a matter of law. Accordingly, Defendants' motion to dismiss Counts One and Two is granted.

## II. Counts III through V: Breach of Quasi-Contract Claims

Defendants also move to dismiss Counts Three, Four, and Five of the Complaint asserting the quasi-contract claims of quantum meruit, unjust enrichment, and promissory estoppel. Under New York law, unjust enrichment and quantum meruit are not separate causes of action. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *Unicorn Crowdfunding, Inc. v. New St. Enter.*, 2019 U.S. Dist. LEXIS 99008, at *13-15 (S.D.N.Y. June 12, 2019).[10] Accordingly, the Court analyzes them together.

### A. Unjust Enrichment and Quantum Meruit

Because the Statute of Frauds bars the oral agreement, Plaintiff's quasi-contract and equitable claims must be dismissed as well. *Morgenweck v. Vision Capital Advisors, LLC*, 410 F. App'x 400, 402 (2d Cir. 2011). Indeed, the Statute of Frauds does not automatically bar an unjust enrichment claim. *Unicorn Crowdfunding, Inc.,* 2019 U.S. Dist. LEXIS 99008, at *13-15. However, a plaintiff cannot recover damages that depend on an "oral agreement otherwise barred by the Statute of Frauds." *Sequoia Healthcare Servs., LLC v. Essex Capital Corp.*, 763 F. App'x 13, 16 (2d Cir. 2019) (quoting *RTC Props., Inc. v. Bio Res., Ltd.*, 295 A.D.2d 285, 286, 744 N.Y.S.2d 173 (N.Y. 2002)).[11]

---

[10] *See also Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 663 (2d Cir.1996) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 768 F.Supp. 89, 96 (S.D.N.Y.1991)(explaining that "quantum meruit and unjust enrichment are not separate causes of action," and that "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract"), *rev'd on other grounds,* 959 F.2d 425 (2d Cir.1992)).

[11] *See also Castellotti v. Free,* 138 A.D.3d 198, 208, 27 N.Y.S.3d 507 (N.Y. 2016) (recovery on an unjust enrichment claim "cannot extend to benefits . . . allegedly due under [an] oral agreement" barred by the Statute of

It is well settled that under New York law a plaintiff may not escape the Statute of Frauds by attaching the label "quantum meruit" or "unjust enrichment" to the underlying contract claim. *Morgenweck*, 410 F. App'x at 402; *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.,* 56 F.3d 427, 434 (2d Cir.1995) (discussing quantum meruit (citing *Farash v. Sykes Datatronics, Inc.,* 59 N.Y.2d 500, 503, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (1983))); *Merex A.G. v. Fairchild Weston Systems, Inc.,* 29 F.3d 821, 824–25 (2d Cir.1994) (discussing promissory estoppel); *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV,* 754 F.Supp.2d 610, 616 (S.D.N.Y.2010). Thus, Plaintiff may not make quasi-contract claims while claiming the parties entered into a valid oral agreement in 2017. Unjust enrichment and breach of contract claims cannot coexist unless "there is a bona fide dispute as to the existence of a valid and enforceable contract or where the contract does not cover the dispute in issue." *Morgenweck,* 2010 U.S. Dist. LEXIS 141637, at *13-14 (quoting 22A N.Y. Jur. Contracts § 541 (2008); *see also Martin H. Bauman Associates, Inc. v. H&M Inter'l Transport*, 171 A.D.2d at 484, 567 N.Y.S.2d at 408 (holding that "a cause of action under a quasi-contract theory 'only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent another party's unjust enrichment'")(citations omitted). Specifically, where a valid agreement requires a plaintiff to perform the very service on which he bases his unjust enrichment claim, the unjust enrichment claim will fail. *Morgenweck,* 2010 U.S. Dist. LEXIS 141637, at *13-14; *see also Zito v. Fischbein, Badillo, Wagner & Harding*, 35 A.D.3d 306, 831 N.Y.S.2d 25 (1st Dept. 2006) (finding recovery for services in quantum meruit precluded where "an enforceable oral contract exist[ed] that covered the matter of plaintiff's compensation").

Here, Plaintiff only argues that there is a genuine dispute as to the duration of the oral

---

Frauds); *Zeising v. Kelly*, 152 F.Supp.2d 335, 345 (S.D.N.Y. 2001) ("Plaintiff cannot simply restate his contract claim, which is barred by the Statute of Frauds, in an attempt to obtain damages in a quasi-contractual claim").

agreement; not that a valid oral agreement existed covering the dispute at issue. Compl. ¶ 51.

Under these circumstances, Plaintiff's unjust enrichment and quantum meruit claims must be

dismissed.

### B. Promissory Estoppel

Plaintiff's promissory estoppel claim fails for similar reasons. Under New York law, to

succeed on a claim for promissory estoppel, a plaintiff must show "a clear and unambiguous

promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an

injury sustained by the party asserting the estoppel by reason of his reliance." *See R.G. Group,*

*Inc. v. The Horn & Hardart Co.*, 751 F.2d 69, 78(2d Cir.1984) (citation omitted). Like quasi-

contract claims, promissory estoppel claims are often brought as alternatives to actions for

breach of contract. *See Tri–Country Motors, Inc. v. American Suzuki Motor Corp.*, 494

F.Supp.2d 161, 173, (E.D.N.Y.2007), aff'd, No. 07–3275–C4, 2008 WL 5063291_ Fed.Appx.

(2d Cir., Nov. 24, 2008). However, Courts in this circuit have pointed out that,

> [E]ven if a plaintiff is able to establish promissory estoppel, New York Courts
> have further restricted the application of the theory, so as not to undermine the
> important policies underlying the Statute of Frauds, to the limited class of
> cases in which 'the circumstances are such as to render it unconscionable' to
> refuse to enforce the promise upon which the promisee has relied.

*Id.* (citing *Sterling Interiors Group, Inc. v. Haworth, Inc.,* No. 94 Civ. 9216, 1996 WL 426379, at

*21 (S.D.N.Y. July 30, 1996); *Morgenweck*, 2010 WL 9478990, at *6 (S.D.N.Y. June 3,

2010), aff'd, 410 F. App'x 400 (2d Cir. 2011); *Merex A.G. v. Fairchild Weston Systems, Inc.,* 29

F.3d 821, 825–26 (2d Cir.1994), cert. denied, 513 U.S. 1084, 115 S.Ct. 737 (1995) (citing *Philo*

*Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1997) (cautioning against applying the

promissory estoppel doctrine liberally and ruling "[t]o invoke the power that equity possesses to

trump the Statute of Frauds plaintiff must demonstrate 'unconscionable' injury, i.e., injury

beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement.")

Here, Plaintiff's promissory estoppel claim seeks to improperly circumvent the Statute of Frauds; it seeks to recover amounts it would not be entitled to as a matter of contract. Further, Plaintiff provides no evidence that demonstrates "unconscionable injury" resulting from the alleged estoppel. Plaintiff's equitable claim cannot stand here because "the mere failure to obtain an uncertain prospective benefit does not rise to a sufficient level of unconscionability to warrant the application of the doctrine of promissory estoppel." *Country-Wide Leasing Corp. v. Subaru of America, Inc.*, 133 A.D.2d 735, 520 N.Y.S.2d 24 (2d Dep't 1987).

In sum, because the crux of Plaintiff's Complaint are oral agreements barred by the Statute of Frauds, Optionality's quasi-contract and promissory estoppel claims must be dismissed as well.

### III.     Counts VI and VII: Federal and New York Trade Secrets law

#### A.  General Standard

To succeed on a misappropriation of trade secrets claim under New York law, a party must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)); *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 U.S. Dist. LEXIS 10730, at *8 (S.D.N.Y. Jan. 23, 2018).

Similarly, The Defend Trade Secrets ("DTSA") provides a private cause of action to the "owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The Act prohibits the

theft, duplication, receipt, or possession of trade secrets "related to a product or service used in or intended for use in interstate or foreign commerce" for the economic benefit of anyone other than the owner when the actor intends or knows that the offense will injure the owner of the trade secret. *Case Props. Servs., LLC v. Columbia Props. Phx., L.P.*, No. 17-cv-03110 (NSR), 2018 U.S. Dist. LEXIS 158199, at *12 (S.D.N.Y. Sep. 17, 2018) (quoting 18 U.S.C. § 1832).[12]

To survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value. *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 U.S. Dist. LEXIS 10730, at *11 (S.D.N.Y. Jan. 23, 2018); *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190, 2016 U.S. Dist. LEXIS 43525, 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) ("New York and Second Circuit law . . . requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed . . . ." (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-9292, 2008 U.S. Dist. LEXIS 12017, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008))).

In New York, "trade secret law . . . does not offer protection against discovery by fair and honest means". *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 U.S. Dist. LEXIS 10730, at *11 (quoting *Faiveley Transp. Malmo AB*, 559 F.3d at 117). Similarly, the DTSA definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy." *Id.* (quoting *Broker Genius*, 2017 U.S. Dist. LEXIS 198951, 2017 WL 5991831, at *11). Information used "in breach of an agreement or confidential relationship" may constitute misappropriation, *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 567 (S.D.N.Y.

---

[12] *See also* 18 U.S.C. § 1839(3)(A)-(B); *Broker Genius, Inc. v. Zalta*, No. 17-cv-2099, 280 F. Supp. 3d 495, 2017 U.S. Dist. LEXIS 198951, 2017 WL 5991831, at *11 (S.D.N.Y. Dec. 4, 2017)("The DTSA... requires that the plaintiff establish 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" (quoting *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016))).

2016), but a "claim for misappropriation requires bad faith." *Ferring B.V. v. Allergan, Inc.,* 4 F. Supp. 3d 612, 628 (S.D.N.Y. 2014).

## B. Application

Defendants do not contest whether Plaintiff's allegations satisfy *Twombly* and *Iqbal* pleading requirements. Defendants argue Plaintiff's misappropriation claims are duplicative of its breach of contract claims and therefore must be dismissed. The Court disagrees.

Under New York law, "[w]here the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract; otherwise plaintiff is limited to an action in contract." *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003); *Opternative, Inc. v. JAND, Inc.*, 2018 U.S. Dist. LEXIS 132827, at *25 (S.D.N.Y. Aug. 7, 2018). However, a defendant "may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." *Id.*

Optionality sufficiently alleged that Defendants' misappropriated its trade secrets. Defendants contention that misappropriation claims cannot relate to the underlying contract is misplaced. In *A Star Grp., Inc. v. Manitoba Hydro*, the court dismissed a misappropriation claim that relied exclusively on the confidentiality provisions in the underlying contracts. 2014 U.S. LEXIS 88825, at *7 (S.D.N.Y. 2014). Optionality's misappropriation claims do not.[13] Plaintiff alleges that Defendants acquired both confidential information and trade secrets from the business relationship between the parties that grew independently of the NDA and RSA. Taking the allegations in the Complaint as true, Defendants used Optionality's trade secrets and

---

[13] Though Optionality disclosed confidential information to Edge TG Asia to evaluate business possibilities, this was not the full extent of their relationship. Comp. ¶ 36.

confidential information to secure cybersecurity business without sharing these profits with Optionality. *Id.* ¶ 71. Defendants acquired Optionality's trade secrets under circumstances which gave rise to Defendants' duty to maintain their secrecy and use those trade secrets for the sole benefit the Opt-Edge Partnership. *Id.* ¶ 141.

Similarly, in *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp 2d 343 (S.D.N.Y. 2010), the court addressed how a misappropriation claim may "…be connected with and dependent upon the contract" and stated that a defendant's breach of contract may also constitute a breach of an independent duty in tort "if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." *Id.* at 353. Likewise, Plaintiff alleges Defendants used Optionality's trade secrets to solely benefit Defendants and simultaneously deprive Optionality of these benefits. Comp. ¶ 145.

Furthermore, Optionality sufficiently alleges a DTSA claim, as the Complaint specifically identifies the trade secrets, its ownership of those secrets, and their value. *See* Compl. ¶¶ 135-145. Therefore, Plaintiff's federal and state misappropriation claims survive this stage of litigation and Defendants' motion to dismiss Counts Six and Seven is denied.

## IV.   Optionality's Remaining Claims

### C. Count VIII: Fraud

To succeed on a common-law fraud claim under New York Law, a plaintiff must allege "that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 250 N.E.2d 214, 302

N.Y.S.2d 799 (N.Y. 1969)). Rule 9(b) of the Federal Rules of Civil Procedure also requires fraud claims to be pleaded with "particularity", meaning a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Furthermore, "although Rule 9(b) permits knowledge to be averred generally, [courts] have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotations omitted); *see also Kelly v. Jefferies Grp., Inc.*, No. 1:17-cv-2432 (ALC), 2018 U.S. Dist. LEXIS 26090, at *17-18 (S.D.N.Y. Feb. 15, 2018). A strong inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, NA.*, 459 F.3d 273, 290-91 (2d Cir. 2006).

**1.    Application**

Defendants argue that Plaintiff's fraud claims should be dismissed for two reasons: 1) Plaintiff's failed to plead its fraud claim with the requisite specificity required by Rule 9(b) and 2) the fraud claim is duplicative of the breach of oral partnership claim, and as such is impermissible. The Court agrees.

As a threshold matter, the Court points out that the Complaint goes to great lengths to address Mr. Nekos' and Mr. Pecoraro's statements and actions. The pleadings adequately specify the statements that were allegedly false or misleading, provide particulars as to the alleged falsity of the statements, state the time and place the statements were made, and identity the persons

who made them. *See* Compl. ¶¶ 42, 44  46-47, 49, 51, 54-55, 58-59, 63, 71-72. Despite clearing these hurdles, the Complaint falls short of proving Defendant's fraudulent intent.

It is well-settled that general allegations of a profit motive are insufficient for the purpose of pleading fraudulent intent. *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13-CV-3303 (PGG), 2015 U.S. Dist. LEXIS 36087, 2015 WL 1307189, at *7 (S.D.N.Y. Mar. 23, 2015) (quoting *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12-CV-4025 (AT), 2013 U.S. Dist. LEXIS 178462, 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013)). "Motives that are common to most corporate officers ... do not constitute 'motive' for the purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

Here, Plaintiff alleges the individual Defendants' made fraudulent representations "to defraud Optionality into believing they were moving forward with CyberSAIF while they were actually creating Edge's own cybersecurity offering." Compl. ¶¶  61, 71, 91. These allegations do not suggest the individual Defendants "benefitted in some concrete and personal way from the purported fraud." *Id.* The allegations do suggest the individual Defendants' general profit-seeking motive, common among corporate officers, which are insufficient to allege fraudulent intent. *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 U.S. Dist. LEXIS 20758, at *10 (S.D.N.Y. Apr. 18, 2006) ("[A]llegations that defendants stand[] to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)"); *Harrell v. Primedia, Inc.*, 2003 U.S. Dist. LEXIS 13595, at *3 (S.D.N.Y. Aug. 6, 2003) ("[T]he mere fact that Defendants had a desire to see the company succeed does not provide a motive to engage in serious fraud.")

Furthermore, Plaintiff's claims are duplicative of the breach of contract claims. "It is well

settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims . . . regardless of whether the alleged contract is unenforceable." *Stillman v. Townsend*, 2006 U.S. Dist. LEXIS 50770, at *6 (S.D.N.Y. 2006). Defendants' alleged fraudulent acts all arise from or relate to the oral partnership agreement Plaintiff's claim Defendants breached. However, "[w]here a fraud claim is premised upon an alleged breach of contractual duties, and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, 2012 U.S. Dist. LEXIS 51841, at *10 (S.D.N.Y. Apr. 12, 2012). Essentially, fraud claims predicated on "misrepresentations of a future intent to perform under a contract" are not actionable under New York law. *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017) ("Under New York law, false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud"). *See also Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) ("'A mere refusal to perform an oral agreement within the Statute [of frauds]… is not such fraud as will justify a court in disregarding the statute, even though it result in hardship to the plaintiff.'" (quoting *Bulkley v. Shaw*, 289 N.Y. 133, 139, 44 N.E.2d 398 (1942)).

Therefore, the Complaint fails to allege fraudulent acts distinct from the alleged duties under the oral agreement. This fraud cause of action simply claims Defendants represented to Plaintiff it planned to move forward with the oral partnership when it had no intention to do so. That is insufficient to state a plausible fraud claim. Accordingly, Defendants' motion to dismiss Count VIII is granted.

### D. Count IX: Breach of Fiduciary Duty

Under New York law, the elements of a claim for breach of fiduciary duty are "breach by a

fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." *MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 431 F. App'x 17, 19 (2d Cir. 2011). To state a claim for breach of fiduciary duty, the plaintiff must allege a "special relationship" that "transcends an ordinary business relationship." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 500 (S.D.N.Y. 2017). Plaintiff alleges that "Optionality and Edge were partners, as memorialized through their oral Agreement and confirmed in emails and internal and external documents," and Edge owed Optionality a fiduciary duty. Defendants deny this claim and point to the Draft Agreement explicitly stating a partnership did not exist.

Ultimately, irrespective of formal titles attributed to the parties involved, the existence and scope of a fiduciary relationship "depends on the factual nature of the relationship [between them]." *Salomon Bros., Inc. v. Huitong Int'l Tr. & Inv. Corp.*, No. 94-CV-8559 (LAP), 1996 U.S. Dist. LEXIS 17358, 1996 WL 675795, at *2 (S.D.N.Y. Nov. 21, 1996). This is "a factual determination" that is typically "not susceptible to determination on a motion to dismiss." *Id.* New York deploys a "flexible" definition, defining a fiduciary relationship as "one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Am. Tissue*, 351 F. Supp. 2d at 102 (quoting *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-05 (N.Y. App. Div. 2d Dep't 1976)). "Such a relationship might be found to exist, in appropriate circumstances, between close friends . . . or even where confidence is based upon prior business dealings." *Holmes v. Lorch*, 329 F. Supp. 2d 516, 526 (S.D.N.Y. 2004) (quoting *Penato*, 383 N.Y.S.2d at 904-05).

Under this standard, the Court cannot conclude at this stage, as a matter of law, that the parties lacked a fiduciary relationship. Plaintiff specifically alleges that Edge and Optionality were engaged in a partnership. The Complaint also details the parties' relationship and its growth

from offering CyberSAIF in one region to creating a partnership to expand the offerings to the U.S. and the U.K. Comp. ¶¶ 25-69. Even if the parties were not partners as the term is recognized in law, the alleged relationship may have given rise to fiduciary duties between the parties. Essentially, as alleged, the parties had extensive dealings and were more than mere strangers dealing at arms-length.

These allegations allow the claim to survive; discovery is the proper stage to determine the scope of the parties' relationship. Accordingly, Defendants' motion to dismiss Count IX is denied. *See, e.g., Lau v. Mezei*, No. 10-CV-4838 (KMW), 2012 U.S. Dist. LEXIS 116608, 2012 WL 3553092, at *11 (S.D.N.Y. Aug. 16, 2012).

### V.      Counts I-V and VIII are Dismissed Without Prejudice

Plaintiff's request leave to amend the Complaint. "Leave to amend should be freely granted." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002). Furthermore, Defendants have not alleged any good reason to deny Plaintiff's request such as futility, bad faith, undue delay, or undue prejudice. *See Id.* Accordingly, Counts One through Five and Count Eight are dismissed with leave to amend.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The claims are dismissed without prejudice and Plaintiff's request to amend the Complaint is GRANTED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 27.

**SO ORDERED.**

**Dated:**  September 18, 2019
        New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

24