USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: January 29, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **OPTIONALITY CONSULTING PTE. LTD,** | |
| Plaintiffs, | |
| -against- | 18-CV-5393 (ALC) |
| **EDGE TECHNOLOGY GROUP LLC ET AL,** | **MEMORANDUM AND ORDER** |
| Defendants. | |

**ANDREW L. CARTER, JR., District Judge:**

Plaintiff, Optionality Consulting PTE. LTD ("Plaintiff") commenced this action on June 14, 2018 against Edge Technology Group LLC, James Nekos, and John Pecoraro ("Defendants") related to the parties' commercial relationship. Defendants now move to dismiss the Amended Complaint. For the following reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

### A. The Parties

Optionality, founded in 2011 by Maria Gabriela Bianchini, is a consulting firm incorporated under the laws of Singapore that specializes in global financial regulatory issues. Am. Comp. ¶¶ 1, 12. In 2015, Optionality developed CyberSAIF, a corporate-governance led cyber security offering tailored to the legal, regulatory, and business needs of alternative asset managers, for instance hedge funds, venture capital, and private equity groups. *Id.*

Edge is a United States corporation proficient in the technical aspects of cybersecurity. Am. Compl. at ¶ 2. On March 14, 2016, Emily Randall, Managing Director of Edge TG Asia Pte. Ltd ("Edge TG Asia"), reached out to Optionality and expressed a desire to offer a product to address

an issue between hedge fund management and IT security. *Id*. at ¶ 26. On March 17, 2016, Edge TG Asia and Optionality executed a global Non-Disclosure Agreement (the "NDA"). *Id*. at ¶ 32. James Nekos and John Pecoraro are directors of Edge TG Asia.[1] *Id*. To evaluate business possibilities with Edge TG Asia, Optionality disclosed Confidential Information to Edge TG Asia. *Id*. at ¶ 36.

### B. The Revenue Sharing Agreement

The discussions facilitated by the NDA led to the execution of a Revenue Sharing Agreement (the "RSA") that was effective as of May 1, 2016. Am. Comp. ¶ 37.[2] According to Plaintiff, due to stalling by Edge Hong Kong, the RSA was not signed until September 14, 2016. *Id.* Edge Hong Kong and Optionality agreed that Edge Hong Kong would receive 61% and Optionality would receive 39% of the revenues under the RSA, resulting in a 61/39 revenue split. *Id*.

Section 1.1 defines the scope of the relationship: "The Parties hereby agree to jointly develop, promote and market a "Cyber:SAIF" offering that is a combination of information technology and corporate governance services." Section 2 reads: "the Parties acknowledge that each brings valuable assets and intellectual property to Cyber:SAIF. The joint marketing materials relating to the Cyber:SAIF service and the Intellectual Property Rights relating to the Cyber:SAIF name shall be jointly owned by the Parties." *Id*. Section 5.3 of the RSA provides that it would not be a limitation on either party's ability to market its own services to potential clients, and expressly limited the geographic scope of the parties' agreement: "[E]ach party may continue to market their

---

[1] Specifically, the parties to the NDA are Plaintiff and Edge TG Asia Pte Ltd, an EDGE Singapore affiliate.
[2] The Court previously found in its September 18, 2019 decision that the RSA was incorporated by reference. That remains true in the present Amended Complaint. In deciding a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference … and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000); *see also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Specifically, the parties to the RSA are Plaintiff and Edge TG Hong Kong Limited, an EDGE subsidiary.

own individual product offerings, which for clarity may include the services each Party offers as part of the Cyber:SAIF service. For clarity, this Agreement . . . applies only to Parties and their affiliates located in Singapore and Hong Kong." *Id*. Section 6.1 of the RSA also provided that the parties were not partners or in a joint venture.[3] Section 6.4 of the RSA also contained an integration clause that provided: "This Agreement completely and exclusively states the agreement between Optionality and Edge regarding its subject matter. This Agreement supersedes and governs all prior or contemporaneous understandings, representations, agreement, or other communications between Optionality and Edge, oral or written, regarding such subject matter." Finally, the RSA also provided in Section 6.10 that its terms could not be waived by any alleged course of dealing without a signed writing, and that no claims of course of conduct could expand the limited scope of this simple agreement. *Id*.[4]

### C. Subsequent Agreements

After securing multiple clients in Hong Kong, Edge sought to replicate this success outside of Asia. Am. Comp. ¶ 42. On November 29, 2016, Mr. Nekos, an Edge director, expressed to Ms. Bianchini, "[l]et me know when you are in town and available again. The expansion of what we started with the JV have been a topic of discussion and I would like to know your thoughts about the US market. Looking forward to it." *Id*. On January 11, 2017, Bianchini and Nekos met in New York City and agreed to enter a partnership between Edge and Optionality. *Id*. at ¶ 44.

On July 18, 2017, Ms. Bianchini met with EDGE directors to discuss the formal launch of CyberSAIF in the U.S. Am. Compl. ¶ 51. There, the parties agreed to devote their respective

---

[3] Section 6.10 of the RSA specifically provides: "Optionality and Edge are independent contractors and this Agreement shall not establish any relationship of partnership, joint venture, employment, franchise or agency between Optionality and Edge."
[4] Section 6.1 of the RSA specifically provides: "No course of dealing shall be deemed to amend the Agreement in the absence of a writing signed by duly authorized representatives of each party."

companies' resources to their new joint venture, which included developing the U.S. CyberSAIF offering. *Id.* Edge and Optionality further agreed that: (a) Optionality's trade secret and confidential information would be used to pitch prospective clients; (b) Optionality's trade secret and confidential information would be used in providing services to these clients; (c) Edge would use its confidential customer list to pitch CyberSAIF to clients; (d) Edge would use its confidential information on its existing customers in order to secure and service clients; (e) Optionality personnel would perform all high-value analysis and implementation based on that analysis; and (f) Edge would provide the technical assistance for that analysis. *Id.*

The parties agreed that Optionality would develop the materials for a CyberSAIF offering in the U.S. and U.K., and Optionality and Edge would jointly pitch CyberSAIF to Edge's U.S. clients. Am. Compl. ¶ 52. The parties also agreed that each would split profits, losses, and be afforded voting rights in accordance with the same 61/39 split provided in the RSA, with Edge receiving 61% and Optionality receiving 39%. *Id.*

Months later, Optionality and Edge co-ventured to sell CyberSAIF. Am. Compl. ¶ 57. The parties continuously referred to CyberSAIF as a partnership or a joint venture in emails, internal and external documents, and orally. *Id.* In client pitch materials, as well as on the CyberSAIF.com website, CyberSAIF is shown as a joint offering from Optionality and Edge, accompanied by the slogan, "A Partnership Built on Expertise." *Id.* Optionality, believing the parties' agreed to a partnership, spent hundreds of hours developing CyberSAIF materials, hired staff to service the new fully spun entity, and forewent other lucrative business opportunities. *Id.*

In August of 2017, Ms. Bianchini conducted joint CyberSAIF marketing meetings with Mr. Nekos and developed the statement of work for Client 'T'. Am. Compl. ¶ 58. Mr. Nekos and Ms. Bianchini conducted joint meetings regarding CyberSAIF's launch. *Id.* Ms. Bianchini then met

with Mr. Pecoraro and an EDGE information security engineer to outline CyberSAIF and its component parts. *Id*. During this meeting, Ms. Bianchini described cybersecurity services in detail, which included Optionality's trade secret and confidential information, the necessary components of a CyberSAIF proposal, and how this information should be presented in the proposal for Client. *Id*.

### D. Optionality's Allegations and the Draft Agreement

In January 2018, Mr. Pecoraro stopped responding to Optionality's inquiries. Am. Compl. ¶ 71. Mr. Nekos and Ms. Randall continued to push CyberSAIF's development by approving material and jointly pitching clients. *Id*. at ¶¶ 75-84. Mr. Pecoraro remained unresponsive and worked to create an Edge version of the higher value cybersecurity components using Optionality's trade secrets to reduce Optionality's participation in the global offering, effectively an Edge-Dominant offering. *Id*. at ¶¶ 72, 74-76.

On March 26, 2018, Mr. Pecoraro reappeared to address the parties' revenue share split. Am. Compl. ¶ 85. Mr. Pecoraro stated that he had questions about the Agreement's 61/39 revenue split and suggested that he believed the parties had always treated the Opt-Edge Partnership as a series of individual deals that could be formalized later on. *Id.*

Mr. Pecoraro separately informed Ms. Bianchini that Edge's European staff had received requests regarding the digital privacy legislation known as the General Data Protection Regulation ("GDPR"). Am. Compl. at ¶ 86. The GDPR acted as a single law with a single set of regulations to protect individuals' personal data. *Id.* These regulations equally applied to all companies doing business in the EU. *Id.* Therefore, the GDPR presented as a business opportunity for the Opt-Edge partnership, and CyberSAIF and Opt-Edge were positioned to profit from marketing its systems to businesses throughout the UK. *Id.* at ¶ 87.

According to the Amended Complaint, Ms. Bianchini was alarmed that Mr. Pecoraro believed that the agreement was no more than a series of deals to which Optionality nor Edge had formally committed. *Id.* at ¶ 88. Due to this and the impending GDPR opportunity, on March 28, 2018, Ms. Bianchini called Mr. Pecoraro. *Id.* Ms. Bianchini was concerned that Mr. Pecoraro would use Optionality's trade secrets to take advantage of the GDPR. *Id.* During the call, Ms. Bianchini reminded Mr. Pecoraro that the 61/39 revenue split used in Asia was effective globally. *Id.* After becoming frustrated that Mr. Pecoraro was apparently looking to block the ability of Opt-Edge to profit from the GDPR opportunity, Ms. Bianchini demanded to meet with the EU technologist that Mr. Pecoraro spoke with regarding the GDPR. *Id.* Afterwards, Mr. Pecoraro stated that he would be away from the office until April 9 and nothing could happen until after he returned. *Id.* As Mr. Pecoraro had not quelled Ms. Bianchini's concerns, Ms. Bianchini broached the subject of reducing the agreement to writing, and Mr. Pecoraro replied that he also thought it was time to reduce the agreement to writing between Optionality and Edge for the U.S. and the U.K. *Id.* at ¶ 89.

This prompted Ms. Bianchini to express her belief that the parties should reduce the entire Agreement to writing. *Id*. Mr. Pecoraro shared the belief and asked Optionality to send a written agreement for his review. *Id*.

Optionality then sent Edge a Draft Agreement.[5] The cover email transmitting the Draft Agreement to Edge states:

> the only changes are (1) to change the dates of the agreement to now (2) to amend and restate to include both US and UK (2) to take out the language in

---

[5] See Exhibit B to the Pecoraro Declaration. Plaintiff did not attach the Draft Agreement to the Original Complaint or the Amended Complaint, but it is specifically pleaded in the Original Complaint and the Amended Complaint. See Am. Compl. ¶ 90. Therefore, the Court may consider it in deciding this Rule 12(b)(6) motion. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (complaint incorporated by reference emails where plaintiff "referred in her complaint to [the] e-mails"); *Worldwide Servs. v. Bombardier Aero. Corp.*, 2015 U.S. Dist. LEXIS 130974, at *24-25 (S.D.N.Y. Sept. 22, 2015) (emails incorporated by reference in complaint because "documents [were] clearly referenced by the [c]omplaint" and "highly relevant").

section 5.3 that limited the agreement to Asia. That's it. Otherwise, it's the document we negotiated and agreed about 18 months ago.[6]

According to the amended complaint, Ms. Bianchini believed that Mr. Pecoraro would stall the execution of an agreement that accurately represented the material terms of the agreement. Am. Compl. ¶ 90. Therefore, instead of memorializing the actual terms of the agreement in the RSA, Ms. Bianchini suggested that they instead replicate the RSA that was used for Edge TG Asia. *Id*. Ms. Bianchini believed that Mr. Pecoraro would not object to the draft RSA, which she attached in an email for Mr. Pecoraro's execution. *Id*. Plaintiff states that the RSA was materially different from the Agreement, but preserved the 61/39 revenue split, which was agreed to 18 months ago. *Id.* Moreover, the RSA expanded the geographic scope of the agreement to include the US and UK. *Id.* The Draft RSA went unsigned by both parties, and the terms of the Agreement were never altered.

On April 27, 2018, Mr. Pecoraro produced a marketing book to Ms. Bianchini labeled "Edge Security Services". Am. Compl. ¶ 96. These marketing documents overwrote CyberSAIF, falsely stated that Edge created the offering, and claimed it as part of an Edge Security Services offering. *Id.* Edge circulated these documents to at least one client group. *Id*.

On May 4, 2018, Ms. Bianchini sent a letter to Mr. Nekos expressing her concern that Edge had: (1) taken steps to delay scaling CyberSAIF in the U.S.; (2) sought to prevent Optionality from seeking other technical partners; and (3) worked to suppress Optionality's enterprise value while simultaneously "withholding cybersecurity marketing and development efforts from Optionality for the purpose of expanding into Optionality's side of the partnership, in an apparent effort to claw back part of our revenue share or somehow drive us out." Am. Comp. ¶ 98. Ms. Bianchini noted: "[s]uch behavior violates our binding agreements to jointly develop CyberSAIF as a

---

[6] *See* ECF 28-2.

partnership, is fraudulent misrepresentation, [and] takes our intellectual property". *Id.* Ms. Bianchini asked Edge to immediately perform its obligations under the Agreements. *Id.* In response, Mr. Nekos refused to perform its obligations under the Agreements and threatened to formally terminate the relationship. *Id.* at ¶ 99. To date, Edge has only jointly pitched CyberSAIF to a handful of its global client base. *Id.* at ¶ 102.

## PROCEDURAL BACKGROUND

Plaintiff filed the original Complaint on June 14, 2018. ECF No. 1. Defendant then moved to dismiss the complaint, and on September 18, 2019, the Court granted in part and denied in part the motion to dismiss and granted plaintiff leave to amend the complaint. ECF No. 32. Specifically, the Court dismissed Counts I-V and VIII. *Id.*

Plaintiff filed the Amended Complaint on October 11, 2019. ECF No. 33. The Amended Complaint includes the following nine counts: 1) breach of contract based on the alleged Partnership Agreement; 2) breach of contract based on the alleged Global Revenue Sharing Agreement; 3) unjust enrichment; 4) quantum meruit; 5) promissory estoppel; 6) misappropriation of trade secrets under the Defend Trade Secrets Act of 2016; 7) misappropriation of trade secrets under state law; 8) fraud; and 9) breach of fiduciary duty. *Id.*

On March 5, 2020, Defendants filed the instant motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 39, 40. Plaintiff filed its opposition on April 2, 2020 and Defendants replied on April 30, 2020. ECF Nos. 41-42. The Court considers the motion fully briefed.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007);

*see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts as true all factual allegations in the complaint and draws all reasonable inferences in plaintiff's favor. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S, at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

## DISCUSSION

I.     **Counts I-V: Plaintiff's Contract Claims**

   a. **Inconsistencies between the Original Complaint and the Amended Complaint**

Relying on this Court's decision in *Kant*, Defendant urges the Court to not consider the Amended Complaint's allegations regarding the Oral Agreement and Draft RSA as they directly contradict the allegations in the Original Complaint. Def.'s Mem. of Law at 8–10; *Kant v. Columbia Univ.*, No. 08 Civ. 7476, 2010 WL 807442 (S.D.N.Y. Mar. 9, 2010). As an initial matter, the Court will not accept Plaintiff's amended allegations regarding the Draft RSA and Oral Agreement in the Amended Complaint.

In *Kant*, a *pro se* Plaintiff attempted to file a second amended complaint. That action

involved a professor who alleged his supervisors promised him a term position if he completed certain requirements. *Kant*, 2010 WL 807442, at *8. However, the Plaintiff alleged in his first amended complaint that he received an orally made employment contract where performance would span two years. *Id.* Then, in his motion to file a second amended complaint, directly contradicted those same facts, providing that the same employment contract's performance would only span one year. *Id.* The court then determined that the plaintiff changed his allegations so as to comply with the statute of frauds. *Id.* at 6–7. That, among many other stark changes in the facts and allegations within the complaint, demonstrated plaintiff's bad faith. *Id.* As the court provided in its opinion, ("Kant's unexplained new recollection concerning this critical aspect of his alleged oral agreement with Columbia officials-first asserted ten months after his original complaint was filed and after Defendant had moved to dismiss under the statute of frauds—strongly suggests bad faith.") *Id.* at 8. Thus, the Court denied Plaintiff's request for leave to file a second amended complaint, finding that the plaintiff acted in bad faith.

While the Court finds that the allegations in Plaintiff's Amended Complaint do not directly contradict the allegations in the Original Complaint, Plaintiff's attempt to expand on deficiencies that were in the Original Complaint is unavailing.

Plaintiff's Original Complaint was silent as to the term or duration of the Oral Agreement. However, in the Amended Complaint, Plaintiff now asserts that the Oral Agreement "could have, and probably would have been performed in less than one year." See Am. Compl. at ¶ 4. Regarding the Draft RSA, in the Original Complaint, Plaintiff failed to put forth any allegations distinguishing the terms of the Oral Partnership from the Draft RSA. Now, in the Amended Complaint, Plaintiff asserts that the Draft RSA was distinct from the Oral Agreement, and that the Draft RSA was provided (rather than memorializing the actual terms of the Oral Partnership) because Ms.

Bianchini was worried about Mr. Pecoraro's sudden "about face" regarding the terms of the Agreement and their revenue split. Am. Compl. at ¶¶ 85–90. Therefore, Plaintiff posits that Ms. Bianchini's focus in sending the Draft RSA was to memorialize the 69/31 revenue split, rather than the explicit terms of the Oral Agreement, and, if executed, the Draft RSA would have significantly altered the alleged Oral Agreement. *Id.*

Plaintiff's new allegations, squarely fitting within the statute of frauds, leads the Court to believe that they are not being forth in good faith. Plaintiff's unexplained recollection of these critical facts surrounding the Draft RSA, its inception and the reason for sending it, and the Oral Agreement cannot be reconciled with the Original Complaint.

Plaintiff's allegations in the original complaint stated that the parties were "venturing based on the Agreement" and decided to reduce that "Agreement" to writing. Plaintiff failed to distinguish this Draft RSA from the alleged Oral Agreement in the Original Complaint, and the email confirmed that the Parties were merely extending an existing Agreement that was referenced in the Original Complaint. Moreover, in light of the three-year term provided for in the Draft RSA, there was great incentive to distinguish the Oral Agreement–which Plaintiff now alleges "could have, and probably would have been performed in less than one year"– from the Draft RSA. In light of the Original Complaint's silence on the new allegations, as well as the sudden recollection of critical facts related to the Draft RSA, the Court cannot accept these allegations. Otherwise, Plaintiffs would easily circumvent the statute of frauds. Therefore, Plaintiff's contract claims remain barred by the statute of frauds. Accordingly, the Court dismisses Counts I-V of the Amended Complaint, consistent with the Court's September 18, 2019 opinion.

Moreover, any leave to amend is denied on bad faith grounds. *See* D*asrath v. Stony Brook Univ. Med. Ctr.*, No. 12 CV 1484, 2014 WL 1760907, at *5 (E.D.N.Y. Apr. 29, 2014); G*urvery v.*

*Cowan, Liebowitz & Latman, P.C.*, No. 06 Civ. 1202, 2013 WL 3718071, at *11 (S.D.N.Y. July 15, 2013) (denying motion to amend where, among other reasons, plaintiff's numerous misrepresentations "are clearly intended to mislead the Court" and are "evidence of her bad faith"); *Whimisicality, Inc. v. Battat*, 27 F. Supp. 2d 456, 465 (S.D.N.Y. 1998) (denying motion to amend where, among other reasons, plaintiff acted in bad faith by intentionally misleading the court).

**Counts VI and VII: Federal and New York Trade Secrets law**

**A. General Standard**

To succeed on a misappropriation of trade secrets claim under New York law, a party must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)); *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 U.S. Dist. LEXIS 10730, at *8 (S.D.N.Y. Jan. 23, 2018).

Similarly, The Defend Trade Secrets Act ("DTSA") provides a private cause of action to the "owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The Act prohibits the theft, duplication, receipt, or possession of trade secrets "related to a product or service used in or intended for use in interstate or foreign commerce" for the economic benefit of anyone other than the owner when the actor intends or knows that the offense will injure the owner of the trade secret. *Case Props. Servs., LLC v. Columbia Props. Phx., L.P.*, No. 17-cv-03110 (NSR), 2018 U.S. Dist. LEXIS 158199, at *12 (S.D.N.Y. Sep. 17, 2018) (quoting 18 U.S.C. § 1832).[7]

---

[7] *See also* 18 U.S.C. § 1839(3)(A)-(B); *Broker Genius, Inc. v. Zalta*, No. 17-cv-2099, 280 F. Supp. 3d 495, 2017 U.S. Dist. LEXIS 198951, 2017 WL 5991831, at *11 (S.D.N.Y. Dec. 4, 2017)("The DTSA… requires that the plaintiff establish 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through

"Although the Second Circuit has not articulated a specificity requirement, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." ExpertConnect, L.L.C. v. Fowler, No 18 Civ. 4828, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019). Thus, to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value. *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 U.S. Dist. LEXIS 10730, at *11 (S.D.N.Y. Jan. 23, 2018); *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190, 2016 U.S. Dist. LEXIS 43525, 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) ("New York and Second Circuit law . . . requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed . . . ." (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-9292, 2008 U.S. Dist. LEXIS 12017, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008))).

In New York, "trade secret law . . . does not offer protection against discovery by fair and honest means". *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 U.S. Dist. LEXIS 10730, at *11 (quoting *Faiveley Transp. Malmo AB*, 559 F.3d at 117). Similarly, the DTSA definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy." *Id.* (quoting *Broker Genius*, 2017 U.S. Dist. LEXIS 198951, 2017 WL 5991831, at *11). Information used "in breach of an agreement or confidential relationship" may constitute misappropriation, *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016), but a "claim for misappropriation requires bad faith." *Ferring B.V. v. Allergan, Inc.,* 4 F. Supp. 3d 612, 628 (S.D.N.Y. 2014).

---

improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" (quoting *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016))).

In Defendants' original motion to dismiss, they failed to contest whether Plaintiff's allegations satisfied *Twombly* and *Iqbal* pleading requirements. In the present motion, Defendant now argues that Plaintiff has failed to identify their alleged trade secrets with sufficient particularity. Defs. Mem. of Law at 24. The Court disagrees.

Optionality has adequately pleaded that Defendants misappropriated its trade secrets. Specifically, Plaintiff alleges that the trade secrets included information related to the creation, methodology, and usage of the data harvest and the actionable report, including tools, formulas, templates, specific project opportunities, business strategy and other information. Am. Compl. ¶ 154. Plaintiff states that Defendants acquired their trade secrets under circumstances that gave rise to maintain their secrecy and use those trade secrets for the limited benefit of the Opt-Edge Partnership or the RSA. Am. Compl. ¶ 159. Plaintiff alleges that Mr. Pecoraro worked to create an Edge version of the higher value cybersecurity components using Optionality's trade secrets. Am. Compl. at ¶¶ 72, 74-76. Plaintiff further alleges that Optionality's trade secrets are in fact secret and not a matter of public concern; Optionality expended considerable capital in an effort to develop the trade secrets; the trade secrets have become available to potential clients and are now being used to compete with Plaintiff. *Id.* at ¶¶ 157–165. Plaintiff has pleaded their claim with sufficient specificity. *See*, *e.g.*, *Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017) (complaint adequately described trade secrets as "technical data, internal pricing information, work product, research, engineering designs"); *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d at 789 (S.D.N.Y. 2008) (complaint adequately described trade secrets as "manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors"); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 2015 WL 9704079, at *9 (S.D.N.Y. Dec. 23, 2015) (finding

description of trade secret as "manufacturing processes used to create" security seals sufficiently specific).

Furthermore, as previously stated in the Court's September 18, 2019 opinion, Optionality sufficiently alleges a DTSA claim, as the Complaint specifically identifies the trade secrets, its ownership of those secrets, and their value. *See* Am. Compl. ¶¶ 139-165. Therefore, Plaintiff's motion to dismiss Counts Six and Seven is denied.

### Count VIII: Fraud

Plaintiff argues that the Court dismissed the original fraud claim "based solely on its conclusion that Optionality failed to adequately allege that Mr. Nekos and Mr. Pecoraro 'benefitted in some concrete and personal way from the purported fraud' and alleged only 'misrepresentations of a future intent to perform under the contract.'"

That is a limited view of the Court's opinion. While Plaintiff is correct that the Court relied on Plaintiff's failure to adequately allege fraudulent intent as a basis for the Court's dismissal, the Court also dismissed the Complaint because Plaintiff failed to allege fraudulent acts distinct from the alleged duties under the oral partnership, and Plaintiff's new allegations do not cure that deficiency here.

"It is well settled under New York law that a party cannot maintain overlapping fraud and breach of contract claims . . . regardless of whether the alleged contract is unenforceable." *Stillman v. Townsend*, 2006 U.S. Dist. LEXIS 50770, at *6 (S.D.N.Y. 2006). Defendants' alleged fraudulent acts all arise from or relate to the oral partnership agreement Plaintiff's claim Defendants breached. However, "[w]here a fraud claim is premised upon an alleged breach of contractual duties, and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Cont'l Petroleum*

*Corp. v. Corp. Funding Partners, LLC*, 2012 U.S. Dist. LEXIS 51841, at *10 (S.D.N.Y. Apr. 12, 2012). Essentially, fraud claims predicated on "misrepresentations of a future intent to perform under a contract" are not actionable under New York law. *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017) ("Under New York law, false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud"). *See also Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) ("'A mere refusal to perform an oral agreement within the Statute [of frauds]… is not such fraud as will justify a court in disregarding the statute, even though it result in hardship to the plaintiff.'" (quoting *Bulkley v. Shaw*, 289 N.Y. 133, 139, 44 N.E.2d 398 (1942)).

Plaintiff's memorandum of law argues that the fraud claim is not duplicative as it is premised on Mr. Nekos and Mr. Pecoraro's misrepresentations about the Edge-Dominant offering. Pl.'s Mem. of Law at 22. This is insufficient. Plaintiff's claims regarding the Edge-Dominant offering are intrinsically tied to Plaintiff's allegations regarding Defendant's alleged misrepresentations with moving forward with the Oral Partnership and do not greatly differ from Plaintiff's Original Complaint. Therefore, as the Court previously ordered, the Amended Complaint fails to allege fraudulent acts distinct from the alleged duties under the oral agreement. This fraud cause of action simply claims that Defendants misrepresented their actions in working on opportunities toward the Partnership when it had no intention to do so and instead created an Edge-Dominant offering. That is insufficient to state a plausible fraud claim. Accordingly, Defendants' motion to dismiss Count VIII is granted.

### B. Count IX: Breach of Fiduciary Duty

Under New York law, the elements of a claim for breach of fiduciary duty are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and

damages." *MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 431 F. App'x 17, 19 (2d Cir. 2011). To state a claim for breach of fiduciary duty, the plaintiff must allege a "special relationship" that "transcends an ordinary business relationship." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 500 (S.D.N.Y. 2017).

Ultimately, irrespective of formal titles attributed to the parties involved, the existence and scope of a fiduciary relationship "depends on the factual nature of the relationship [between them]." *Salomon Bros., Inc. v. Huitong Int'l Tr. & Inv. Corp.*, No. 94-CV-8559 (LAP), 1996 U.S. Dist. LEXIS 17358, 1996 WL 675795, at *2 (S.D.N.Y. Nov. 21, 1996). This is "a factual determination" that is typically "not susceptible to determination on a motion to dismiss." *Id.* New York deploys a "flexible" definition, defining a fiduciary relationship as "one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Am. Tissue*, 351 F. Supp. 2d at 102 (quoting *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-05 (N.Y. App. Div. 2d Dep't 1976)). "Such a relationship might be found to exist, in appropriate circumstances, between close friends . . . or even where confidence is based upon prior business dealings." *Holmes v. Lorch*, 329 F. Supp. 2d 516, 526 (S.D.N.Y. 2004) (quoting *Penato*, 383 N.Y.S.2d at 904-05).

Defendants argue that the Draft RSA, explicitly stating a partnership did not exist, defeats this claim. Defendant fails to provide any new arguments that would persuade the Court to dismiss Plaintiff's breach of fiduciary duty claim. As previously ordered, Plaintiff puts forth detailed factual allegations regarding the parties' relationship, the growth of the relationship, the offering of CyberSAIF in one region, Asia, to the creation of a partnership to expand the offerings to the U.S. and the U.K. Am. Comp. ¶¶ 25-69; *See Poller v. VioScrip*, Inc., 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) ("A breach of fiduciary duty, and generally in tandem, of loyalty, 'occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade

secrets [or] misuse of confidential information[.]'") (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)).

Even if the parties did not create a partnership as the term is recognized in law, the alleged relationship may have given rise to fiduciary duties between the parties. The parties had extensive dealings and were more than mere strangers dealing at arms-length.

These allegations allow the claim to survive; discovery is the proper stage to determine the scope of the parties' relationship. Accordingly, Defendants' motion to dismiss Count IX is denied. *See, e.g., Lau v. Mezei*, No. 10 Civ. 4838, 2012 U.S. Dist. LEXIS 116608, 2012 WL 3553092, at *11 (S.D.N.Y. Aug. 16, 2012).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part. Counts I-V and VIII are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 39.

**SO ORDERED.**

**Dated:** **January 29, 2021**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**